Good morning to all of you and welcome to our court. Just two or three brief preliminary observations that I wanted to make. First, Judge Branch and I wanted to welcome our visiting judge, Judge Ursula Ungaro, who sits on the United States District Court for the Southern District of Florida, where she has sat for more than 20 years. She was appointed by President Bush, 41, in 1992. We are delighted to have her join us and help us, really, with our work. Second observation, again, for those of you who have not appeared before our court, you will notice that we have an elaborate lighting and time system, which really just tells you how much time you've got left in the course of your argument. And there is a green light, which means you can go, of course, and proceed, a yellow warning light, which is just a two-minute warning, and the red light means that your time is up. When that light goes on, we'd be much appreciative if you could bring your remarks to a conclusion. It doesn't mean you've got to stop in the middle of a sentence, but if you could bring it to a conclusion, we would be much appreciative. I'm sort of commenting lately that we have had a colleague on our court who, for many years, used to remark every time that he presided over our sitting that the red light was not aspirational. So if you could bring him to a head, we'd be much appreciative. Third and last, when you proceed with your argument, you may safely assume we've had a chance to review not just the briefs, the record excerpts, but in many instances, we've had a chance to review the record as well. So feel free, in the course of your argument, to go right to the heart of your argument. With that, we'll proceed with the first of our cases, which was Dr. Griffin versus Coca-Cola and UnitedHealthcare. May it please the Court, my name is Chambers Waller, and this morning I have the honor of representing the appellant, Dr. W.A. Griffin, in her two appeals this morning. And before I get started with my argument, I quickly want to thank the Court for appointing me to these cases and giving me an opportunity to represent an outstanding client in two very important cases. As I'm sure you know, these are not Dr. Griffin's first appeals in the Eleventh Circuit, so the question that has to get answered is, what's different? And what's different is this Court has never considered the anti-assignment provisions that have barred Dr. Griffin's previous claims in the context of the Herman 2 case from the Fifth Circuit in 1992. And this Court has never considered the estoppel and waiver arguments that Dr. Griffin has made in the context of that Herman 2 case, as well as a Ninth Circuit case that has cited the context of a multitude of federal district courts, including courts from the Southern District of Florida and the Northern District of Georgia, that have found estoppel and or waiver in similar ERISA cases regarding the enforceability of anti-assignment provisions. Now the alternative holding in Herman 2 related to whether or not the anti-assignment provision in that case applied generally, but the primary holding related to the plan administrator in that case being estopped from asserting the anti-assignment provision at all. And so with Court's permission, I would like to talk first about the estoppel and waiver issues. Now in Herman 2, you had similar facts to what we have today. You have a provider who receives an assignment of benefits from a participant or beneficiary of the ERISA. But excuse me, but not so similar, right? Because there was a lot of communication between the ERISA plan and the, and MEBA, the hospital, there was a lot of communication between the healthcare provider and the ERISA plan administrator, as Mrs. Herman, is that, I'm not sure I'm correct about that, was being admitted into the hospital. And there were repeated communications. In this case, Dr. Griffin has no communication with United, I guess it is, until, unless you count the fact that she files the appeal. That's her communication is the appeal after the denial, partial denial of benefits. The first communication, I think in both of the Coca-Cola and Delta cases today would have been when she submitted the claim originally. But in following the submission of the claim and after it was denied or at least partially denied, you have the first appeal and then you have a response from United Healthcare. And then you have a second appeal and another response from United Healthcare. And that's the same in both the Coca-Cola and Delta case. Actually, the record I think is a little inconsistent. I'm not sure that they're exactly parallel. In one case, there's the communication, the United communicates with the beneficiary both times and copies Dr. Griffin. And I think in the other case, the record is not clear as to whether the plan communicates with Dr. Griffin directly on the second appeal. Yes, Your Honor. I think in the Coca-Cola case, you have both of those communications from United directly to the patient. But as you said, they both copied Dr. Griffin on both of those communications. In the Delta case, in the record, we do have the first appeal and the response back from United Healthcare, which if I'm not mistaken, was also directed to the patient copying Dr. Griffin. We don't have the actual second level appeal or the response. We don't have those actual documents in the record in the Delta case. But Dr. Griffin has pled the fact of those appeals being sent and that response being sent. Those have been pleaded in her amended complaint, Your Honor. But isn't it accurate that the communications going back to the patient in these appeals gave to the patient all the reasons why more monies were not being paid as far as the patient was concerned? Well, in terms of the actual responses being directed to the patient and only copying Dr. Griffin, I think that's safe to say, yes, Your Honor. But so how and how is the insurance company, if the insurance company is responding to the patient and saying, this is what we've paid, here's why we're not going to pay more. Why would an insurance company in communicating with a patient have an obligation to say, and by the way, we have an anti-assignment provision that we're also basing this denial on? That really wasn't why the insurance company was not paying more money. They were responding to the patient under the terms of the insurance contract. This is the reason this has been paid in full, right? Well, Your Honor, I think it raises, I think your question raises two questions and that's why would they copy Dr. Griffin on the response in the first place? But second, we can't forget that in both cases, in both sets of appeals, Dr. Griffin specifically asked for the presence of an anti-assignment provision and whether or not they were going to assert it. But part of the problem there is what was their duty to respond to that? What was her right to assert that and what was their, and did they have a duty to respond? Well, in the assignments, in both cases themselves, they were assignment of the patient's rights and benefits under the ERISA plans. Specifically those assignments included the right to receive plan documents. That was one of the specific, specifically enumerated boxes that the patient checked, the right to receive plan documents. So as far as Dr. Griffin knew, she had a valid assignment that gave her the right to receive those plan documents and she was being copied on responses from UnitedHealthcare saying, you know, that were denying her appeals, but that weren't, they weren't referencing any anti-assignment provision despite specific requests that they produce it if they were going to rely on it. She even cited the original Hermann Hospital case from 1988 and the Fifth Circuit. But those responses never came. Was she paid in full as an out-of-network provider? No, Your Honor. She was not paid in full in either case. Her claims in both cases in count one are essentially that she was underpaid. But you understand that in an insurance contract situation, there are certain, the insurance has a contract with the patient to pay certain percentage for in-network and certain percentage for out-of-network. Yes. Was she paid as in full, the full percentage that an out-of-network provider was entitled? I think if you ask the insurer, if you ask UnitedHealthcare, they would say yes, Your Honor. I think that's correct. I want to say that at least in one of the plans, it was I think 60% of the bill charges for an out-of-network provider. I haven't done the math to see exactly what it was to see what she was on. So she was paid as an out-of-network provider, but she's seeking additional funds because that's just a percentage of what the bill was. That's my understanding. Yes, Your Honor. I still would like a little more clarification on the basis of the waiver and estoppel arguments. Is it your contention that because the insurance companies entertained the appeals, that's the waiver? Your Honor, I think it's not necessarily just that they entertained the appeals. I think the estoppel and waiver arguments are supported factually by the fact that she specifically requested, in both cases, she requested whether or not an anti-assignment provision was present in the plans, which she didn't have access to the documents in the first place, and they never responded. How does that establish an intentional relinquishment of a right, privilege, advantage, or benefit? Well, it establishes an intentional relinquishment. You understand the reason I ask is that we speak of waiver being the voluntary relinquishment of a known right, and it requires the existence at the time of the waiver of a right, privilege, or advantage, or benefit, which may be waived. It requires showing an actual or constructive knowledge, and perhaps for our purposes, most of an intentional relinquishment of such right, privilege, or advantage. You could hardly suggest that simply because they considered the appeal that that constituted an intentional relinquishment, could you? Well, Your Honor, I think there are two points to raise in response to that question. The first is, we have to remember that these cases were dismissed on 12b6 motions, and so we haven't had any discovery in either of these cases as to what actually happened in the claims review process. We don't know anything about what the claims fiduciaries did in determining whether or not they were going to, you know, what their thought process was, what they, what their reasoning was. Why does that matter? It could matter in the context of whether or not they intentionally relinquished it, Your Honor. If, if Dr. Griffin is granted an opportunity to... Right, but you've got to allege enough specifically to plausibly establish a known voluntary and intentional relinquishment of a right. And simply because they've heard the appeal, I don't think establishes the kind of intentional relinquishment. They could have heard it for any number of reasons. They would have been obliged to hear it anyway. Your Honor, I see my time is about to run out, can I ask you, can I answer your question? No, but you, please. Well, I think, again, from a factual perspective, the fact, it wasn't just that Dr. Griffin submitted claims and was denied. They considered it and they denied it. What else is there in this record that you can point us to that shows the intentional relinquishment of a known right? Dr. Griffin's specific request for either the existence or potential application of intent... To which they were silent and said nothing. Not once, but twice, yes, Your Honor. Why does that show a known relinquishment? There may be any number of reasons that they did that. One of them may be the reason you suggest. Another reason might be they didn't want to waste any more time with her. It's entirely possible, Your Honor. Right? I mean, there are any number of plausible theories, but I guess what I'm asking is, how does their silence establish the waiver? Their silence... Given that it wasn't the ineluctable inference that one would have to draw. It was a possibility among a multitude of others. Your Honor, the... You see what I'm sort of trying to get at? Because you've got to plausibly say enough. I understand we're on 12b-6, but you've got to put enough on the table to say, this is sort of a plausible theory. And I'm not sure that you have simply by saying, A, they didn't respond, and B, they entertained the appeal. Is there anything else lurking in this record that you can point us to from which you could plausibly conclude a waiver? Nothing that I haven't already mentioned, Your Honor. I didn't mean to cut you off. I think you... Anything else you want to say on this waiver point? I just do want to stress that this is, again, both of these cases were dismissed on 12b-6 motions, and so Dr. Griffin hasn't had an opportunity to develop a complete record about what intentional relinquishment there may have been. But when you construe the facts in the light most favorable to her, when you take all the district courts that have considered this issue, she has alleged a plausible theory of waiver and estoppel, and if it goes out on summary judgment, it goes out on summary judgment. But she's shown enough to defeat 12b-6 motions, and for that reason, we respectfully request that the district court's orders be reversed.  Yes. May it please the Court. My name is Tashwanda Pinchback-Dixon, and I'm representing the appellees in this matter. Appellant has argued that although this court has already decided, in eight prior cases that Dr. Griffin's claims are without merit, that the anti-assignment clauses within planned documents are unambiguous and enforceable, that the only thing that has changed now is Herman 2. However, Herman 2 is not anything new. It's nothing different. It was determined in 1992 before this court set its precedent, and Physicians Multispecialty Group— Of course, in all of the Griffin cases, none of them were published, right? That is correct. So none of them have precedential value. That is correct. But Physicians Multispecialty Group— They may be persuasive, but there's no precedent that we're obliged to follow. That is correct, Your Honor. But Physicians Multispecialty Group did establish the precedent in the 11th Circuit that subsequent cases have followed as binding precedent. So here we have two different planned documents, one for Coca-Cola, one for Delta. Both plans authorize direct payments to providers, and both plans prohibit assignment of any other rights or benefits, including Dr. Griffin's right to bring this case, and that's what the District Court dismissed this case on. Starting with the Delta plan, if you look at Volume 1, page 116 of 136, paragraph 9.03, you'll see that the plan authorizes direct payment of claims to the provider of services. However, that direct payment is limited by Volume 1, page 126 of 136, paragraph 1307, which directly prohibits the participant from assigning all or any portion of the benefit payment under the plan, unless otherwise indicated by the Administrative Committee, which Dr. Griffin has not pled, has happened in this case. Similarly, Coca-Cola, actually in that case, the anti-assignment that was found on Record Site Volume 1, page 123 of 222, is actually identical to the anti-assignment that this was an unambiguous and enforceable in-physicians multispecialty group. It includes a direct authorization, an authorization of direct payment to the healthcare provider, but again prohibits any assignment or alienation of the payment. Therefore, because there are unambiguous anti-assignment clauses in both the Delta and the Coca-Cola plan, Dr. Griffin did not have standing to bring this case. Let me ask you the same question that I asked opposing counsel. Was Dr. Griffin paid, pursuant to the insurance company's perspective, paid in full as an out-of-network provider? Yes, Your Honor. She was paid in full, 60% is my understanding of what was allowed under the terms of the plan. One thing that I do want to note is that because both plans allowed direct payment to the provider, and also in both plans they allowed for the provider to submit the claim as well as appeal the claim, that is why they accepted the appeals and the claims from Dr. Griffin on behalf of the patient. So if we want to move into the estoppel argument or the waiver argument, an appellant's argument that by communicating with or by addressing the appeals and communicating with the patients about the appeals submitted by Dr. Griffin that we somehow waived our right to assert the anti-assignment, we actually did not have a need to assert the anti-assignment until Dr. Griffin filed the lawsuits. Prior to that, she was still operating under the terms of the plan, which allowed for providers to file claims as well as file appeals on behalf of their patients. There's also, there's no right that Dr. Griffin had to obtain the plan documents from the appellees in this case. There are, there is some case law that talks about whether the medical provider had access to or was provided with copies of plan documents, but here Dr. Griffin has not alleged or pled any reason why she could not have received those plan documents from her patients. And there was no way for appellees to even know that she wasn't able to get those. The patients were the ones who had a right to the plan documents, they could have requested them directly and they did not do that. I'd also like to point out that in Dr. Griffin's assignment, she did not assign the right to receive plan documents. In fact, if you look at the assignment, which is identical in both the Coca-Cola and the is identical in both of those cases, and that can be found at 83 of 153 in the Delta case. You'll see that what she says is that she authorizes the plan administrator or fiduciary to release to the provider plan documents. Case law is clear that an assignment has to be directed, it has to be clear. There, she did not use any language to indicate that she was receiving the right to any plan documents that the patient would have under ERISA. That also relates to the argument that her assignment doesn't cover anything outside of the receipt of benefits because all she says is that it's a direct assignment of rights and benefits under this policy, and the policy and the plan are completely separate from the rights that she would have under ERISA. The court has no other questions. I yield my time. Any other questions? All right. Thank you. Thanks very much. Thank you. Mr. Waller, you have reserved five minutes. Your Honors, the first issue that I want to address is the fact that Appleese contend they didn't need to assert the anti-assignment provisions. I think if Dr. Griffin had not specifically asked for the existence and potential application of those provisions, that that duty may not have arisen. But I think in the context of intentionally relinquishing that right or potentially being a stop from asserting that right, I don't think they can take that position that they didn't need to assert it specifically in the context of several federal district courts that have found estoppel and have found waiver when insurance companies and plan administrators have, the way that Herman Too coined it, was they lied behind the log for several years for a certain period of time only to assert it later. And in the context of estoppel, the Ninth Circuit and Spindex case, which is cited in our brief, they cited Herman Too favorably on the estoppel issue for the contention that Of course, the problem with Herman Too is factually it's also very different beyond it not being binding there. The court determined, and I quote, that it was unreasonable for the defendant to lie behind the log for three years without once asserting the anti-assignment clause while duplicitly dragging out the ongoing negotiations in order to liquidate the claim. You don't have anything like that here, do you? Well, Your Honor, we certainly don't have the temporal aspect. The claims appeal process in both of these cases only lasted a few months. So if you don't take into consideration the time between the second... That was at the heart of what drove the court to exercise its equitable power, wasn't it? Not necessarily. I think it was certainly one aspect of it. And when you look at the cases that have followed Herman Too, in context of estoppel at least, not all of those cases had the same three-year limit. There was cases where it's two years or even less than that. So I think the temporal aspect is just one aspect of what they have to do to either, as we've talked about... Well, I simply quote it to you from what the Fifth Circuit said. What drove them? Lying in wait for three years while duplicitly dragging out the ongoing negotiations to liquidate a claim. And then you've got productive MD. It involved hundreds of instances in which Aetna, in many ways, over an eight-year period recognized the validity of the productive MD's assignments and led them reasonably to believe the assignments were valid. And, Your Honor, we readily concede, as I think we have to, that we don't have the temporal aspect that we saw in those two cases. We don't have the volume that we saw in the two cases that you just referenced. But what we do... You also have a problem here where, according to the insurance company, the claim has been paid in full. There was no dragging out, even for a short period, to avoid paying a claim. The insurance company would say, we paid 60% for an out-of-network provider. Dr. Griffin, because she never had access to the plan documents, there's never really any way for her to fully understand the reasoning for that claim denial? She certainly knows she's an out-of-network provider because she has no contract with the insurance company, correct? That's correct, Your Honor, yes. But in terms of, you know, Judge Marcus, you talked about how the Herman Too Court talked about duplicitously lying behind the log in whatever the language was. I think you still have that in both the Coca-Cola case and the Delta case with Dr. Griffin because she was repeatedly asking specifically for the existence and application of an anti-assignment provision and was repeatedly just ignored on that particular front. And I do want to make sure that I'm clear that we're arguing both estoppel and waiver. And in the waiver context, it's intentional relinquishing of a known right, but there's still potential for the apologies to be a stop from asserting the anti-assignment provision in the first place. And in the Productive MD case that you mentioned, Judge Marcus, they found both estoppel and waiver. And all of this stems from the Fifth Circuit's holding in Herman Too, at least in the Productive MD case. But we've seen Herman Too relied on by Judge Murphy in the Northern District of Georgia. We've seen Herman Too relied on by Judge Jordan in the Southern District of Florida, all in Judge Jordan's case, the Angel Jet Services case from 2010. The court wouldn't grant 12b-6, motion to dismiss, in order to allow the claimant there to develop a complete record, to develop the briefing. And again, if it went out on summary judgment, it went out on summary judgment. Your Honor, if I see my time is up, may I complete my answer? Sure. In the Northern District of Georgia case with Judge Murphy, it's the DeKalb Medical Center case that cited, I know on page 24 footnote 8 of our Coca-Cola brief. In that case, that was a summary judgment case. And Judge Murphy still found estoppel based on Herman Too. So, Your Honors, we think, we know that Dr. Griffin has plausibly alleged enough facts in both of these cases to overcome 12b-6, motions to dismiss. And we respectfully request that the district court's orders be reversed. Thank you much. And I noticed that you took on this appointment at the request of the court. We very much appreciate it. Thank you both. And we'll proceed to the next case. Thank you.